STATE OF MAINE                                      UNIFIED CRIMINAL DOCKET
CUMBERLAND, ss.                            CUMUCD-CR-13-873
*N5B-CUM-9/6/2013*

STATE OF MAINE
Cumberland, ss, Clerk's Office
SUPERIOR COURT

SEP 06 2013

RECEIVED

STATE OF MAINE,

      v.                                          DECISION

ELBA STUTES,

        Defendant.

## FINDINGS

1. On February 1, 2013 at approximately 9:30 p.m., Westbrook Police Sergeant Timothy Morrell drove his cruiser into the rear parking lot of the Cinemagic theater. There was only one car parked in the back lot. The front lot was only half full. There was no entry from the rear parking lot directly into the theater. The only direct entrance was from the main parking lot in the front of the theater. A single car parked in the back lot when the front lot had plenty of parking spaces strongly suggested to Sgt. Morrell, based on his experience, that there was either sex or illegal drug activity afoot.

2. Sgt. Morrell parked his cruiser within 25 feet of the passenger side of the lone car. He did not activate his blue lights. He turned his spotlight on the parked vehicle and observed what he thought was "furtive" activity. When Sgt. Morrell first testified, the furtive activity was unspecific. Then it became movement of the shoulders by the car's two occupants. When recalled to testify Sgt. Morrell testified that he observed one of the occupants trying to hide something. Sgt. Morrell's testimony on this "furtive activity" point was so inconsistent that I am satisfied the

state failed to prove by a preponderance that Sgt. Morrell actually observed objective furtive activity.

3. Sgt. Morrell activated his flashlight and approached the car. He observed the male passenger brushing something off his lap. He also observed both occupants were fully clothed, thus eliminating sex as a suspected activity.

4. Now concentrating on unlawful drugs as a suspected activity, Sgt. Morrell approached the driver's side of the car. Gesturing that the window didn't work, the driver, who was defendant Elba Stutes, voluntarily opened the door so she could speak with Sgt. Morrell. Sgt. Morrell observed that the male passenger was shaking and breathing hard. Sgt. Morrell observed that Ms. Stutes had constricted pupils.

5. Sgt. Morrell asked Ms. Stutes why she was parked alone in the back parking lot when there were so many vacancies in the front parking lot nearer to the theater entrance. Ms. Stutes said they were waiting to pick up her passenger's friend or cousin, an explanation that Sgt. Morrell did not believe.

6. As Ms. Stutes was explaining her unusual choice of parking to Sgt. Morrell, he could smell the distinct odor of crack cocaine. The passenger started to place his hands down between the passenger seat and the center console. Sgt. Morrell told the two occupants of the car to place both hands on the dashboard.

7. Sgt. Morrell radioed for help, specifically asking for Brian Olson, a drug investigative specialist.

8. Concerned about a weapon or the attempted destruction or concealment of evidence, Sgt. Morrell went to the passenger side and observed prescription pill bottles sticking out of the hoodie worn by the passenger, Dana Randall. Mr. Randall told Sgt. Morrell that he was reaching down because he had dropped a knife. Sgt.

2

Morrell ordered Mr. Randall out of the car and ordered him to place his hands on top of the car.

9. Sgt. Morrell handcuffed Mr. Randall for his own protection. While he was doing this he observed a large cube of crack cocaine on the floorboard where Mr. Randall had been sitting. Sgt. Morrell placed Mr. Randall in the back of his cruiser.

10. Sgt. Morrell ordered Ms. Stutes out of the car. He did not Mirandize her. He explained to her that she was not in trouble. He told her that he just wanted to ask her questions about Mr. Randall and the crack cocaine he had seen in the car.

11. Sgt. Morrell questioned Ms. Stutes briefly, secured the cube of crack cocaine and questioned Mr. Randall, who admitted that the cube was cocaine.

12. Sgt. Morrell searched Ms. Stutes car and discovered a knife with the blade open and white residue on the blade.

13. Officer Olson arrived and interrogated Ms. Stutes briefly. He did not Mirandize her. He asked her what had happened that evening. Observing her constricted pupils, he asked her if she had been using drugs. She told him she had been prescribed oxycodone and had taken her normal dose that day.

14. Officer Olson asked Ms. Stutes if she was in possession of anything illegal. She replied that she had two of her aunt's 80-mg. oxycodone in her purse. Officer Olson, without consent, went to the vehicle, retrieved Ms. Stutes purse from the driver's seat, searched it and found the two 80-mg. pills.

15. Ms. Stutes was searched and then arrested.

16. Ms. Stutes was never told she was under arrest. She was never told she could leave if she wished. She was told she was not in trouble.

17. Both officers in the midst of their brief interrogation told Ms. Stutes that they did not believe her.

3

Defendant Elba Stutes has moved to suppress all evidence secured by the Westbrook police following a detention on February 1, 2013. Ms. Stutes further argues that incriminating statements made by her during an interrogation subsequent to the detention should be suppressed because she was not Mirandized.

Concerning the stop, State v. Gulick, 759A.2d 1085 (Me. 2000) provides a proper analytical framework. Sgt. Morrell had good reason to suspect that either sexual activity or drug use was taking place in the lone car he found in the rear parking lot at the Cinemagic theater. The front parking lot that was close to the theater entrance was only half full. It made no sense for someone who wanted to go to the theater to park in the rear lot, where there was no entrance. This was especially true in February. Thus Sgt. Morrell had reason to take reasonable steps to determine if drug use was taking place. In the past in this very situation – a single car in the back parking lot when there was plenty of room in the front parking lot – he had frequently uncovered criminal activity.

Sgt. Morrell's intrusion was minimal and reasonable given the totality of the circumstances. He did not use his blue lights. He used a spotlight and then a flashlight, but these lights would reveal only what would be obvious to the naked eye in daylight. Although he did not see objective furtive activity with the spotlight, he did see the passenger brushing something off his lap when he approached the car. He did not order the driver to open her window or the door. Ms. Stutes opened the door voluntarily. Sgt. Morrell could then see that Ms. Stutes had constricted pupils and that the passenger was shaking and breathing hard. Sgt. Morrell, a 16-year veteran, could also smell the distinctive odor of cocaine.

4

When Sgt. Morrell smelled cocaine, he had grounds to investigate further. The scope of his investigation was reasonably related to the evidence he had at this time. When the passenger placed his hand down between the passenger seat and the center console, Sgt. Morrell ordered both the driver and passenger to keep their hands on the dash.

Concerned about a weapon or the attempted destruction of evidence, Sgt. Morrell told the passenger to exit the vehicle and place his hands on top of the car. At this time Sgt. Morrell observed a large cube of crack cocaine. Then of course he had reason to detain Ms. Stutes and Mr. Randall and conduct a full-scale investigation, which he did.

Sgt. Morrell questioned Ms. Stutes briefly. He did not Mirandize her. Instead he told her she was not in any trouble. Sgt. Morrell turned Ms. Stutes over to Officer Olsen. Officer Olsen also questioned Ms. Stutes briefly, during which time she admitted to having two of her aunt's oxycodone pills. She also maintained that as her aunt's caretaker, she had a right to have the pills. She was then arrested.

Ms. Stutes was not in custody prior to her arrest. Sgt. Morrell told her she wasn't in trouble. There were no cuffs. The two officers questioned her one at a time and for a short period of time. She gave no appearance of being intimidated, even though she did make some incriminating statements. I am satisfied by a preponderance that there were no fourth amendment violations. I am satisfied by a preponderance that she was not in custody. I am satisfied beyond a reasonable doubt that her statements were voluntary.

Ms. Stutes' principal argument is that the stop and all subsequent evidence must be suppressed because being in a high crime area – without any credible evidence of furtive activity – is not by itself sufficient evidence to stop, detain and investigate.

5

There is an abundance of case law to that effect. However, Ms. Stutes was not just in a high crime area. She had parked her car in a high crime area when it made no sense to do so. Sgt. Morrell's considerable experience had taught him that a single car parked in the inconvenient rear parking lot at a time when there was plenty of room in the convenient front lot usually meant that sex or drugs were at play. In this scenario and with this knowledge, Sgt. Morrell was justified in making a minimal investigation to determine what was going on. The use of a spotlight and flashlight and a few questions of the driver – on a voluntary basis – to determine why she was there constituted the type of minimal investigation permitted by the fourth amendment. When this minimal intrusion revealed solid evidence of criminal activity, Sgt. Morrell had grounds to complete the investigation.

For the above stated reasons the clerk, by reference, will make the following enter on the docket:

Defendant Elba Stutes' motion to suppress is denied in all respects.


DATED:     September 6, 2013                    _____
                                               William S. Brodrick
                                               Active-Retired Justice, Superior Court

6